NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

16-P-639                                        Appeals Court


CHRISTIAN BAKER & others[1]  vs.  WILMER CUTLER PICKERING HALE AND
DORR LLP & others.[2]


No. 16-P-639.

Suffolk.     February 13, 2017. - July 21, 2017.

Present:  Kafker, C.J., Carhart, & Desmond, JJ.[3]


Limited Liability Company.  Fiduciary.  Corporation,
     Stockholder, Close corporation.  Attorney at Law, Fiduciary
     duty, Attorney-client relationship.  Conspiracy.  Consumer
     Protection Act, Trade or commerce.  Practice, Civil, Motion
     to dismiss, Consumer protection case.



     Civil action commenced in the Superior Court Department on
May 28, 2015.

     Motions to dismiss were heard by Kenneth W. Salinger, J.


     Dana Alan Curhan for the plaintiffs.

_____

     [1] W. Robert Allison and Blake P. Allison, as trustee of the
W. Robert Allison 2003 Irrevocable Trust.

     [2] Gunderson Dettmer Stough Villeneuve Franklin & Hachigian
LLP, Gary R. Schall, and Emma Eriksson Broomhead.

     [3] Justice Carhart participated in the deliberation on this
case prior to his retirement.

Erin K. Higgins (Kathleen R. O'Toole also present) for Gunderson Dettmer Stough Villeneuve Franklin & Hachigian LLP & another.

Richard M. Zielinski for Wilmer Cutler Pickering Hale and Dorr LLP & another.

KAFKER, C.J.  Minority members of a Massachusetts limited liability company seek to hold the company's attorneys liable for their involvement in an alleged "freeze-out" orchestrated by and on behalf of the majority members.  According to the minority members, the majority members secretly retained the attorneys, one of whom is the daughter of a majority member, to, at least ostensibly, represent the closely held company.  The attorneys then worked behind the scenes to assist the majority in merging the company with and into a newly created Delaware limited liability company, all for the purpose of eliminating significant protections afforded minority members under the Massachusetts company's operating agreement.  By the time the attorneys' involvement came to light, the majority members had unfettered control of the resulting entity, with a new operating agreement that extinguished the minority's rights to, among other things, participate in management, access the company's records, and prevent dilution of their interests.  The minority members, the plaintiffs in this action, responded by asserting claims against the attorneys and their respective law firms for breach of fiduciary duty, aiding and abetting tortious conduct,

civil conspiracy, and violation of G. L. c. 93A. The matter now comes before this court for de novo review after a judge of the Superior Court, acting on motions filed by the defendants, dismissed the plaintiffs' claims against the attorneys and their law firms for failure to state a claim upon which relief can be granted. See Mass.R.Civ.P. 12(b)(6), 365 Mass. 754 (1974). For the reasons discussed below, we reverse the portion of the judgment dismissing those claims.

The Supreme Judicial Court has stated that counsel for a close corporation can owe a fiduciary duty to individual shareholders. See Schaeffer v. Cohen, Rosenthal, Price, Mirkin, Jennings & Berg, P.C., 405 Mass. 506, 513 (1989) (Schaeffer). Whether such a fiduciary relationship exists in a particular case is largely a question of fact. Here, taking the facts alleged as true, and drawing all reasonable inferences therefrom in favor of the plaintiffs as nonmoving parties, we conclude that they have alleged enough to plausibly suggest that the defendants, acting as counsel for a limited liability company governed by an operating agreement providing significant minority protections, owed them a fiduciary duty. As the plaintiffs further allege that the defendants secretly worked to eliminate those protections, we conclude that they have done "enough to raise a right to relief [on their claim for breach of fiduciary duty] above the speculative level." Iannacchino v.

Ford Motor Co., 451 Mass. 623, 636 (2008), quoting from Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  We reach the same conclusion as to the claims alleging that, by their actions, the defendant attorneys knowingly aided and abetted and conspired with the majority members in breaching the majority's fiduciary duties to the plaintiffs.  We also conclude that the G. L. c. 93A claim was dismissed prematurely.

Background.  The following facts are derived from the first amended complaint (complaint) filed by the plaintiffs, W. Robert Allison (Allison), Christian Baker (Baker), and Blake P. Allison, as trustee of the W. Robert Allison 2003 Irrevocable Trust (Allison family trust).  On January 28, 2000, Allison and Elof Eriksson (Eriksson) organized Applied Tissue Technologies, LLC, as a Massachusetts limited liability company (ATT-MA or company) for the purpose of developing and marketing wound therapy technologies.  At the time of formation, Allison and Eriksson acquired twenty-five and seventy-five percent membership interests in the company, respectively. Subsequently, Allison and Eriksson both created, and assigned a portion of their interests to, trusts for the benefit of their families -- the Allison family trust and the Elof Eriksson Irrevocable Trust-2003 (Eriksson family trust).  By the time of the events at issue, Allison and the Allison family trust owned a combined 22.5% interest in ATT-MA, Eriksson and the Eriksson

family trust a combined 75.5% interest, and Baker, a former key employee of the company, a 2% interest. Given their combined 24.5% interest, the plaintiffs are collectively referred to in the complaint, and at times herein, as the "minority members."

At the time ATT-MA was formed, Allison and Eriksson also adopted an operating agreement to govern the company's affairs (ATT-MA agreement), which provided, in pertinent part, that:

1. All members have exclusive discretion in the management and control of ATT-MA's business;

2. All members are entitled to participate in management of ATT-MA by a vote proportionate to their interest;

3. The agreement cannot be amended without the unanimous written consent of Eriksson and Allison;

4. The agreement cannot be amended to alter the percentage interest of any member without the consent of each member adversely affected by such an amendment;

5. Members are entitled to examine ATT-MA's books and records at reasonable times;

6. Once having paid an initial capital contribution, no member could be required to make any further capital contributions or loans to the company; and

7. To the extent that any member did advance any further funds, it was to be treated as a loan.

The ATT-MA agreement further provided that each member owed a duty of utmost loyalty and good faith in the conduct of ATT-MA's affairs.[4]

---

[4] There is no copy of the ATT-MA agreement in the record.

By early 2012, ATT-MA was facing a financial shortfall, but Allison and Eriksson could not agree how to address it. Eriksson was prepared to contribute additional funds to the company, but while he had done so in the past in the form of loans, he was now demanding additional equity in return. Under the ATT-MA agreement, such a contribution would require the consent of Allison and any other members whose interests would be diluted. Allison, meanwhile, believed the company would be better served by hiring new management and developing a business plan. Thus, he was prepared to agree to dilute his interest only if the additional capital was provided by outside investors who were bringing new management to the company.

Around this time, Eriksson, with ATT-MA's chief executive officer, Karl Proppe, privately urging him to gain "control" of the company, reached out to the defendant Emma Eriksson Broomhead (Broomhead), an attorney at the defendant law firm of Gunderson Dettmer Stough Villeneuve Franklin & Hachigian LLP (Gunderson). Broomhead is also Eriksson's daughter, and the two had a longstanding attorney-client relationship. Broomhead, in turn, introduced her father to another attorney at Gunderson, the defendant Gary Schall (Schall), who had experience working with emerging companies. On February 14, 2012, Proppe, in his capacity as chief executive officer (CEO), signed an agreement engaging Gunderson as counsel for the company. The agreement

expressly provided that Gunderson would not represent any individual members of ATT-MA. Approximately two months later, Schall relocated his practice to the defendant law firm Wilmer Cutler Pickering Hale and Dorr LLP (WilmerHale). At that time, WilmerHale, like Gunderson, provided in its engagement agreement with ATT-MA that the firm would be representing only the company.

According to the complaint, Broomhead and Schall were aware that ATT-MA was a closely held company, whose members owed each other the duty of utmost loyalty and good faith. They were also familiar with the ATT-MA agreement and the protections it afforded to minority members. Indeed, they immediately set about devising and presenting a plan to Eriksson to both circumvent those protections and eliminate the minority members.[5] All the while, according to the complaint, Broomhead and Schall deliberately concealed their engagement by ATT-MA, as well as their actions on behalf of Eriksson, from Allison and the other minority members.

Broomhead's and Schall's original plan was for Eriksson to offer to buy Allison's membership interest in ATT-MA, and if that failed, to sell the company to a new entity controlled by

---

[5] Broomhead's handwritten notes from an early meeting with Eriksson and Schall reflect that they discussed two options: (1) "get rid of [Allison and Baker]"; or (2) "liquidate/sell" ATT-MA and start the company anew.

Eriksson. In furtherance of that plan, Broomhead, Schall, Eriksson, and Proppe secretly hired and worked with an appraiser to put a value on ATT-MA that could be used as the basis for the buyout offer. Schall then drafted an electronic mail message (e-mail) for Erikson to send to Allison, detailing the offer. Noting that the draft was written in his "style," Schall advised Eriksson to change it to reflect his own style before sending it to Allison. Eriksson did so and on May 6, 2012, e-mailed the offer to Allison and suggested they meet on May 10 to discuss it.

Allison responded to Eriksson's offer by e-mail on May 8, 2012, copying Proppe and Eriksson's wife, Gudrun Eriksson, who were the trustees of the Eriksson family trust. Allison, who remained unaware of Broomhead's and Schall's involvement, declined the offer and expressed a desire to work to maximize ATT-MA's value so that he could sell his interest at a later time, under more favorable circumstances. Allison further reminded the majority members of several of the minority protections in the ATT-MA agreement and suggested that all members meet to address the issues facing the company. In response, Eriksson cancelled the proposed May 10 meeting and threatened to dissolve ATT-MA.

Eriksson then began working in secret with Proppe, Broomhead, and Schall to effectuate an alternative plan that was

outlined in a written memorandum drafted by Schall on May 9, 2012. The plan relied upon the provisions of G. L. c. 156C, § 60, which authorizes a Massachusetts limited liability company to merge with another business entity upon the vote of members owning more than fifty percent of the company, unless the company's operating agreement provides otherwise. Since the ATT-MA agreement was silent on the issue of mergers, the plan called for Eriksson to use his majority position and merge ATT-MA into a new entity. As detailed in Schall's memorandum, the merger would also allow the majority to, among other things, terminate the ATT-MA agreement; install Eriksson and Proppe as the board of directors of the "new" entity; convert Eriksson's outstanding loans to ATT-MA into preferred stock in the new entity, while simultaneously converting all existing membership interests into common stock; and allow Eriksson to make future contributions in return for additional preferred stock. Regarding Allison, the memorandum suggested that the merger would eliminate his "ability to interfere with company operations" and, as additional funds were invested in the new entity over time, reduce him to "a smaller and smaller ownership position."

On May 25, 2012, Eriksson, Proppe, Broomhead, and Schall created a new Delaware limited liability company, also called Applied Tissue Technologies, LLC (ATT-DE). Then, without

holding a meeting or securing the unanimous written consent of all members, as required under the ATT-MA agreement,[6] Eriksson, Proppe, and Gudrun Eriksson executed various documents prepared by the attorneys to effectuate the merger. One of the documents was a new operating agreement (ATT-DE agreement), which eliminated all of the minority protections provided in the ATT-MA agreement, including the minority's rights to participate in management, access information, and prevent dilution of their interests. The ATT-DE agreement further eliminated the provision requiring members to act with utmost good faith and loyalty in the conduct of ATT-DE's affairs.[7]

On the evening of May 29, 2012, Eriksson and Proppe, having accomplished everything necessary to effectuate the plan, met with Allison and informed him for the first time about the merger. They further advised Allison to contact Schall, who was identified for the first time, if he wanted copies of the new ATT-DE agreement and other documents. Only after Allison secured copies from Schall a few days later did he learn of the full extent of the actions that had been taken. Over the

---

[6] According to the complaint, the ATT-MA agreement provided that a meeting could be held only after five days' advance notice to all members, unless members waived notice in writing or executed a written consent approving of the actions to be taken at the meeting.

[7] There is no copy of the ATT-DE agreement in the record.

ensuing months, ATT-DE issued additional preferred shares to Eriksson, Proppe, and Broomhead's husband.  As anticipated in Schall's memorandum, the transactions substantially reduced the interests of Allison and the other minority members.

Allison initially responded by filing a civil action against Eriksson, Proppe, and Gudrun Eriksson in May, 2013, asserting claims for breach of contract, intentional interference with advantageous business relations, breach of fiduciary duty, and civil conspiracy (2013 action).  Then, on May 28, 2015, while the 2013 action was still pending, Allison and the other minority members commenced the present action.[8]

Standard.  In reviewing the allowance of a motion to dismiss pursuant to Mass.R.Civ.P. 12(b)(6), we proceed de novo and consider the same pleadings as the motion judge.  Dartmouth v. Greater New Bedford Regional Vocational Technical High Sch. Dist., 461 Mass. 366, 373 (2012).  In so doing, we accept as true all factual allegations in the complaint and draw any reasonable inferences therefrom in the plaintiffs' favor.  See Golchin v. Liberty Mut. Ins. Co., 460 Mass. 222, 223 (2011). "The ultimate inquiry is whether the plaintiffs alleged such

---

[8] The plaintiffs also asserted claims in this action against Eriksson, Proppe, and Gudrun Eriksson, which were dismissed pursuant to Mass.R.Civ.P. 12(b)(9), as amended, 450 Mass. 1403 (2008), due to the pendency of the 2013 action.  The plaintiffs have not challenged that portion of the judgment.

facts, adequately detailed, so as to plausibly suggest an entitlement to relief."  Greenleaf Arms Realty Trust I, LLC v. New Boston Fund, Inc., 81 Mass. App. Ct. 282, 288 (2012).

Discussion.  1.  Breach of fiduciary duty by attorneys.  To prevail on their claim for breach of fiduciary duty against Broomhead, Schall, Gunderson, and WilmerHale, the plaintiffs must show:  (1) the existence of a fiduciary duty; (2) breach of that duty; (3) damages; and (4) a causal connection between breach of the duty and the damages.  See Hanover Ins. Co. v. Sutton, 46 Mass. App. Ct. 153, 164 (1999).  The defendants maintain that the plaintiffs have failed to clear the first hurdle and plead sufficient facts to plausibly suggest the existence of a fiduciary duty.  We disagree.

"[T]he relationship between attorney and client, like those between trustee and beneficiary, director and corporation, guardian and ward, is fiduciary as matter of law."  Markell v. Sidney B. Pfeifer Foundation, Inc., 9 Mass. App. Ct. 412, 442 (1980) (Markell).  The plaintiffs, however, do not allege that they had an express or implied attorney-client relationship with Broomhead, Schall, Gunderson, or WilmerHale.[9]  To the extent the

---

[9] An attorney-client "relationship may be, but need not be, express; the relationship can be implied from the conduct of the parties."  Page v. Frazier, 388 Mass. 55, 62 (1983).

defendants may have owed the plaintiffs a fiduciary duty,
therefore, it did not arise from such a relationship.

Instead, the plaintiffs argue that a fiduciary duty arose
from the defendants' engagement as counsel for ATT-MA, a closely
held company[10] in which, by law, the shareholders owed each other
a fiduciary duty of utmost good faith and loyalty.  See Donahue
v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578, 593
(1975) (Donahue); Pointer v. Castellani, 455 Mass. 537, 549
(2009) (Pointer).[11]  To that end, the Supreme Judicial Court has
acknowledged, albeit in dictum, that "there is logic in the
proposition that, even though counsel for a closely held
corporation does not by virtue of that relationship alone have
an attorney-client relationship with the individual
shareholders, counsel nevertheless owes each shareholder a
fiduciary duty."  Schaeffer, 405 Mass. at 513 ("Just as an

---

[10] "A close corporation is typified by a small number of
shareholders, no ready market for the corporate stock, and
substantial majority shareholder participation in the
management, direction, and operations of the corporation."
Merriam v. Demoulas Super Mkts., Inc., 464 Mass. 721, 726 n.12
(2013).

[11] "Although the corporate form provides . . . advantages
for the stockholders (limited liability, perpetuity, and so
forth), it also supplies an opportunity for the majority
stockholders to oppress or disadvantage minority stockholders.
The minority is vulnerable to a variety of oppressive devices,
termed 'freeze-outs,' which the majority may employ."  Donahue,
367 Mass. at 588.  "Unscrupulous minority shareholders also may
do damage to the interests of the majority."  Pointer, 455 Mass.
at 551 n.19.

attorney for a partnership owes a fiduciary duty to each partner, it is fairly arguable that an attorney for a close corporation owes a fiduciary duty to the individual shareholders").[12]  See Cacciola v. Nellhaus, 49 Mass. App. Ct. 746, 752 (2000) (Cacciola) (discussing Schaeffer and holding that claim for breach of fiduciary duty against counsel for partnership had been sufficiently pleaded to survive motion to dismiss).[13]

In Schaeffer, supra, the court took particular note of what it described as the "well-reasoned opinion" in Fassihi v. Sommers, Schwartz, Silver, Schwartz & Tyler, P.C., 107 Mich. App. 509 (1981) (Fassihi).  There, Fassihi, a fifty percent shareholder in a closely held professional corporation, brought a claim for breach of fiduciary duty against counsel for the corporation for allegedly assisting the other fifty percent shareholder in ousting him from the corporation.  In addressing the claim, the Michigan court first noted:

> "Although we conclude that no attorney-client relationship exists between plaintiff and defendant, this does not necessarily mean that defendant had no fiduciary duty to

_____

[12] The court in Schaeffer ultimately concluded that it was not necessary to determine whether such a fiduciary duty existed in that case.  405 Mass. at 513.

[13] In Kurker v. Hill, 44 Mass. App. Ct. 184, 187 (1998), this court held that an attorney for an individual shareholder in a close corporation does not owe a fiduciary duty to the other shareholders.

plaintiff.  The existence of an attorney-client relationship merely establishes a per se rule that the lawyer owes fiduciary duties to the client.

"A fiduciary relationship arises when one reposes faith, confidence, and trust in another's judgment and advice. Where a confidence has been betrayed by the party in the position of influence, this betrayal is actionable, and the origin of the confidence is immaterial. . . .  Furthermore, whether there exists a confidential relationship apart from a well defined fiduciary category is a question of fact."

(Footnote omitted.)  107 Mich. App. at 514-515.  The court then went on to note

"the difficulties in treating a closely held corporation with few shareholders as an entity distinct from the shareholders.  Instances in which the corporation attorneys stand in a fiduciary relationship to individual shareholders are obviously more likely to arise where the number of shareholders is small.  In such cases . . ., the corporate attorneys, because of their close interaction with a shareholder or shareholders, simply stand in confidential relationships in respect to both the corporation and individual shareholders."

Id. at 515-516.  Based on Fassihi's assertion that he had reposed trust and confidence in the defendant attorney, whose only prior involvement with the corporation had been drafting the membership agreements, the court held that the claim for breach of fiduciary duty was sufficient to survive a motion for summary judgment.[14]

---

[14] See Brennan v. Ruffner, 640 So. 2d 143, 146-147 (Fla. Dist. Ct. App. 1994) (suggesting minority shareholders may maintain claim for breach of fiduciary duty against counsel for close corporation under certain circumstances not presented in that case); Collins v. Telcoa Intl. Corp., 726 N.Y.S.2d 679, 684 (N.Y. App. Div. 2001) (minority shareholder in close corporation adequately stated claim for breach of fiduciary duty against

As was the case in Michigan according to Fassihi, the determination of whether a fiduciary relationship exists outside one of the well-defined relationships is largely a question of fact in Massachusetts.  See Collins v. Huculak, 57 Mass. App. Ct. 387, 395 (2003).[15]  In the present case, the factual allegations regarding the significant protections afforded to minority members under the ATT-MA agreement loom large in that analysis.[16]  According to the complaint, the ATT-MA agreement required management decisions to be made collectively, even if each member's vote was limited by their proportionate interest in the company.  The agreement also provided that it could not

company counsel for failing to inform him of impending sale of company).

[15] In Doe v. Harbor Schs., Inc., 446 Mass. 245, 252 (2006), the court, reviewing the trial judge's allowance of motions for summary judgment, stated that "[w]here the fiduciary relationship is not one created by law, the existence of the relationship ordinarily is a mixed question of law and fact for which the party asserting the relationship bears the burden."

[16] General Laws c. 156C, the Massachusetts Limited Liability Company Act, defines an "operating agreement" as a "written or oral agreement of the members as to the affairs of a limited liability company and the conduct of its business."  G. L. c. 156C, § 2(9), inserted by St. 2003, c. 4, § 33.  The cochair of the task force that drafted the act described it as "the document which sets forth specifically how the [limited liability company] is organized, how it will operate, and how its economic results will be shared.  A[ limited liability company] operating agreement is roughly analogous to a partnership agreement or a corporation's articles of organization and by-laws."  Parker, The Limited Liability Company:  An Introduction, 39 Boston Bar J. 8, 9 (November/December 1995).

be amended without the unanimous written consent of both Eriksson and Allison.  Still further, the agreement provided that no member's interest in the company could be diluted without that member's consent.  In the context of these allegations, we can see the "logic" in imposing a fiduciary duty on counsel for this closely held company to protect minority rights.  See Schaeffer, 405 Mass. at 513.

For their part, the defendants maintain that there are two important caveats in the case law that suggest no fiduciary duty should be imposed in the instant case.  First, they note that there is no allegation that the minority members reposed trust or confidence in, or even interacted with, Broomhead, Schall, Gunderson, or WilmerHale.  Second, they suggest that there was an actual or potential conflict between ATT-MA and the minority members.

Regarding the defendants' first argument, it is true in Massachusetts that, outside one of the well-defined relationships where the duty arises as a matter of law, "a fiduciary duty exists when one reposes faith, confidence, and trust in another's judgment and advice."  Doe v. Harbor Schs., Inc., 446 Mass. 245, 252 (2006) (Doe) (quotation omitted).  At the same time, "[t]he circumstances which may create a fiduciary relationship are so varied that it would be unwise to attempt the formulation of any comprehensive definition that could be

uniformly applied in every case." Ibid., quoting from Warsofsky v. Sherman, 326 Mass. 290, 292 (1950). It is for this reason that, as noted above, the determination of whether a fiduciary duty exists is largely fact specific. And the factual inquiry here is particularly complicated due to the alleged covert nature of counsel's actions. On the one hand, there are no allegations in the complaint of any personal history or interaction between counsel for the company and the minority members, but on the other, the complaint does allege that counsel should have communicated with the minority members, particularly given the terms of the ATT-MA agreement providing strong protections of minority rights. Instead of communicating with minority members about the proposed actions, counsel allegedly took purposeful steps to conceal their activities undermining the ATT-MA agreement. Given the protections contained in the ATT-MA agreement, the minority members should have been able to repose trust and confidence that any counsel hired by the company would have communicated and consulted with them prior to undoing those protections. See generally Doe, supra. In light of those allegations, we cannot conclude, as a matter of law, that company counsel did not owe a fiduciary duty to the minority members because of the lack of a prior relationship and interaction.

As to the defendants' second argument, it is also true that while an attorney in Massachusetts may owe a duty to a nonclient whom the attorney knows, or reasonably should foresee, will rely on his or her services, such a duty is less likely to be imposed "where an attorney is also under an independent and potentially conflicting duty to a client." Robertson v. Gaston Snow & Ely Bartlett, 404 Mass. 515, 524 (1989), quoting from Page v. Frazier, 388 Mass. 55, 63 (1983). The defendants maintain that such an actual or potential conflict existed here between their client, ATT-MA, and the minority members due to the disagreement between Allison and Eriksson over how to address the company's potential financial shortfall.[17] Once again, however, the analysis in this case is complicated by the significant minority protections in the ATT-MA agreement, including, for example, the requirements that the agreement could not be amended without the unanimous written consent of Eriksson and Allison, and that the agreement could not be amended to alter the percentage interest of any member without the consent of each member adversely affected by such an amendment. Consensual decision-making was

---

[17] "As a general proposition, a lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents." Clair v. Clair, 464 Mass. 205, 215-216 (2013) (quotation omitted). In such a case, the attorney "owe[s] a duty to act according to the interests of the corporation and not in the interests of a nonclient stockholder, director, officer, employee, or other representative of the corporation." Id. at 216 (quotation omitted).

thereby imposed on important matters despite the obvious potential for conflict. The defendants are also alleged to have undertaken representation of the company with full knowledge of those protections. Accordingly, it can plausibly be inferred that the defendants knew, or should have reasonably foreseen, that anyone who served as counsel for the company was constrained by the operating agreement, and the consensual decision-making it imposed on important matters, or at least could not act covertly, in concert with the majority members, for the very purpose of eliminating those protections. Cf. Zimmerman v. Bogoff, 402 Mass. 650, 657 (1988) (Zimmerman) ("Where the alleged wrongdoer can demonstrate a legitimate business purpose for his action, no liability will result unless the wronged shareholder succeeds in showing that the proffered legitimate objective could have been achieved through a less harmful, reasonably practicable, alternative mode of action"). Under these circumstances, the potential for conflict does not serve as a sufficient basis for us to conclude, as a matter of law, that the defendants did not owe a fiduciary duty to ATT-MA's minority members.

2. Aiding and abetting; civil conspiracy. The plaintiffs also asserted claims for aiding and abetting a breach of fiduciary duty and civil conspiracy against Broomhead, Schall, Gunderson, and WilmerHale for their participation in the alleged

freeze-out of the minority members by the majority.  The elements of the tort of aiding and abetting a breach of fiduciary duty are:  (1) there must be a breach of fiduciary duty; (2) the defendants must know of the breach; and (3) the defendants must have actively participated or substantially assisted in or encouraged the breach to such a degree that they could not reasonably have been acting in good faith.  Arcidi v. National Assn. of Govt. Employees, 447 Mass. 616, 623-624 (2006).  The claim for civil conspiracy, meanwhile, similarly requires a showing that the defendants (1) knew that the conduct of Eriksson and the other majority members of ATT-MA constituted a breach of fiduciary duty and (2) substantially assisted in or encouraged that conduct.  See Kurker v. Hill, 44 Mass. App. Ct. 184, 189 (1998) (Kurker).[18]  The defendants now challenge the knowledge and substantial assistance elements common to both claims and argue that the complaint suggests, at most, that the attorneys provided Eriksson and the other majority members with legal advice that turned out to be wrong.[19]  Once again, we disagree.

---

[18] Massachusetts recognizes two forms of civil conspiracy, one requiring independent tort liability, the other coercion.  See Kurker, 44 Mass. App. Ct. at 188-189.  The plaintiffs have asserted the former.

[19] The defendants do not contend, at least at this stage, that the alleged conduct of the majority members did not rise to the level of a breach of fiduciary duty.  In the 2013 action, a

"An allegation that the [majority members] acted under the legal advice of the defendants, without more, is insufficient to give rise to a claim that [the] attorney[s are] responsible to third persons for the . . . acts of [their] clients." Spinner v. Nutt, 417 Mass. 549, 556 (1994). The plaintiffs here, however, have alleged that Broomhead and Schall (1) were aware that they were representing a closely held company where majority and minority members owed each other a fiduciary duty; (2) were aware of the ATT-MA agreement and the minority rights therein; (3) were aware that those rights precluded the majority members from taking the steps they desired in connection with the company; (4) devised a plan to allow the majority to "circumvent" and "evade" those rights; and (5) did so with full knowledge that the plan violated not only the operating agreement, but also the majority's fiduciary duty to the minority. While the facts eventually may establish that the defendant attorneys had a good faith belief that the merger they devised was well-grounded in the law,[20] these allegations are

_____

judge, after a jury waived trial, concluded that, in fact, Eriksson had breached his fiduciary duty to Allison. The judge also noted, however, that it did not appear that Allison had acted consistently with his own fiduciary duties to Eriksson. In any event, the judgment in the 2013 action is now on appeal before this court. See Allison vs. Eriksson, Appeals Court no. 2017-P-0126.

[20] It is worth noting that even a merger that is in technical compliance with the relevant statute can be subject to

sufficient at this stage to suggest that they acted with knowledge that the majority members were breaching their fiduciary duty to the minority members and substantially assisted in the breach. See Mass.R.Civ.P. 9(b), 365 Mass. 751 (1974) (knowledge, like other conditions of mind, can be averred generally).

As noted above, the plaintiffs also allege that the defendant attorneys devised and carried out this plan covertly, in their capacity as counsel for the company, without ever communicating with the minority members, even though the ATT-MA agreement, among other things, (1) afforded all members the right to participate in management, (2) allowed action to be taken only after holding a meeting with advance notice to all members, and (3) required Allison's approval for any amendment to the ATT-MA agreement. The complaint goes even further, alleging that the lack of communication was purposeful and identifying affirmative steps the defendant attorneys took to conceal their involvement from the minority members. Still further, the alleged acts and omissions of the defendant attorneys are colored by the fact that one of them, Broomhead,

---

judicial review in the context of a freeze-out, "and the dissenting stockholders are not limited to the statutory remedy of judicial appraisal where violations of fiduciary duties are found." Coggins v. New England Patriots Football Club, Inc., 397 Mass. 525, 533 (1986).

is the daughter of the primary beneficiary of the plan, Eriksson. Her husband also allegedly benefited from the plan by securing preferred shares in ATT-DE after the merger. At the rule 12(b)(6) stage, with all reasonable inferences drawn in the plaintiffs' favor, the allegations are sufficient to suggest that the defendant attorneys did not merely provide routine legal services but rather substantially assisted the majority in their breach of fiduciary duty.

3. Chapter 93A. Finally, the plaintiffs allege that by participating in the alleged freeze-out of the minority members, the defendant attorneys and law firms engaged in unfair or deceptive acts or practices in violation of G. L. c. 93A, §§ 9 and 11. The defendants argue, however, that the claim should be dismissed because they were not involved in "trade or commerce," a requisite element under both §§ 9 and 11. See G. L. c. 93A, § 2(a) ("[U]nfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful").[21] "Trade or commerce refers to transactions in a business context, which, in turn, is determined by the facts of each case, on consideration of the nature of the transaction, the character of

---

[21] While only the defendants need be engaged in "trade or commerce" under G. L. c. 93A, § 9, the plaintiffs and defendants must be engaged in "trade or commerce" to sustain a claim under § 11. See Frullo v. Landenberger, 61 Mass. App. Ct. 814, 821 (2004). The defendants have not addressed whether the plaintiffs were engaged in trade or commerce.

the parties and their activities, and whether the transaction was motivated by business or personal reasons." Feeney v. Dell Inc., 454 Mass. 192, 212 (2009) (quotations and citations omitted). This determination is typically for the trier of fact and is preferably decided on a fuller record rather than on a motion to dismiss. See Brown v. Gerstein, 17 Mass. App. Ct. 558, 570-571 (1984) (Gerstein); Schinkel v. Maxi-Holding, Inc., 30 Mass. App. Ct. 41, 50 (1991). With this in mind, we conclude that while the "trade or commerce" determination is a novel and close question in this context, the plaintiffs have alleged sufficient facts to plausibly suggest an entitlement to relief. See generally Ritchie v. Department of State Police, 60 Mass. App. Ct. 655, 663 n.14 (2004) (faced with fact intensive and novel theory of recovery, better practice is to deny motion to dismiss and allow parties to develop facts through discovery).

In general terms, "the practice of law constitutes 'trade or commerce' for purposes of liability under c. 93A." Gerstein, 17 Mass. App. Ct. at 570. See G. L. c. 93A, § 1(b) ("trade" or "commerce" includes the "distribution of any services"). Ordinarily, however, "the proper party to assert a c. 93A claim against an attorney is a client or someone acting on a client's behalf." Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 462 (1997). And, as noted above, the plaintiffs do not claim to have had an attorney-client relationship with the defendants.

With that said, the defendants, in the course of their business as attorneys, agreed to represent ATT-MA. Integral to that engagement was an alleged fiduciary duty owed to the plaintiff minority members. While that alleged duty is not the equivalent of an attorney-client relationship, we cannot say, especially at this early stage, that it is not sufficiently akin to one for purposes of satisfying the "trade or commerce" requirements of c. 93A. See McCarthy v. Landry, 42 Mass. App. Ct. 488, 491 (1997) (reversing dismissal of c. 93A claim against attorney for estate where nonclient plaintiff-beneficiary of estate "allege[d] the existence of at least a duty akin to that in an attorney-client relationship").

The defendants suggest that the unfair or deceptive acts or practices they are alleged to have engaged in, namely, assisting the majority members of ATT-MA in freezing out the plaintiffs, involved "principally a private grievance," Zimmerman, 402 Mass. at 663, or an "internal business dispute," First Enterprises, Ltd. v. Cooper, 425 Mass. 344, 348 (1997) (Cooper), which fall outside the conduct of any "trade or commerce" for purposes of c. 93A. See, e.g., Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1, 23 n.33 (1997) ("intra-enterprise" disputes, which include "disputes stemming from an employment relationship, disputes between individual members of a partnership arising from partnership business, and transactions and disputes between

parties to a joint venture and between fellow shareholders," are excluded from c. 93A); Newton v. Moffie, 13 Mass. App. Ct. 462, 467 (1982) ("trade or commerce" requirement is "intended to apply only to dealings between legally separate 'persons' engaged in arm's-length transactions, and not to dealings between members of a single legal entity like a partnership" [footnote omitted]).  The defendants, however, were not members of the entity at issue, ATT-MA, and the fiduciary duty they are alleged to have owed the plaintiffs arose from their engagement as counsel for the company.  The "intra-enterprise" exception to the application of c. 93A, therefore, does not readily apply.

The defendants further argue that, even if the "intra-enterprise" exception does not apply directly, it applies derivatively because they are alleged to have injected themselves into an intra-enterprise dispute, not into trade or commerce.  The cases they cite in support of this proposition, however, are distinguishable.  See Cooper, 425 Mass. at 347-348; Kurker, 44 Mass. App. Ct. at 190-191.  Unlike in the present case, the defendant attorneys in Cooper and Kurker represented other parties and were not deemed to have owed any duty to the plaintiffs.  Here, once again, the defendants, in the ordinary course of their business as attorneys, accepted an engagement as counsel for the company, as a result of which they are alleged to have owed a fiduciary duty to the plaintiff minority members.

In so doing, it is arguable that the defendants did not merely inject themselves into a private dispute, but, rather, engaged in unfair or deceptive acts or practices in connection with professional services they sold in the marketplace.  See Quinton v. Gavin, 64 Mass. App. Ct. 792, 799 (2005).  As such, the allegations in the complaint are sufficient to suggest that the defendants were engaged in "trade or commerce."

Those portions of the judgment dismissing the plaintiffs' claims against WilmerHale, Gunderson, Schall, and Broomhead are reversed.  The judgment is otherwise affirmed.

So ordered.